Louise McCall HOGAN

v.

Harold BROWN, Individually and as Secretary of the United States Department of Defense, John A. Moellering, District Engineer of the Vicksburg District of the United States Corps of Engineers, Ed J. Kilpatrick, Chief, Real Estate Division, Department of the Army, Vicksburg District, United States Corps of Engineers.

Russell MARKS, Proctor Evers, J. Q. Brown, Buck Carter, Mrs. C. C. Durden, Bill P. Walden, Fred B. Hudgens, Billy S. Ball, Joe E. Evants, John H. Robertson, Reece Stanley, Laverne Rabbins and Ross Bryan

v.

Harold BROWN, Individually and as Secretary of the United States Department of Defense, John A. Moellering, District Engineer of the Vicksburg District of the United States Corps of Engineers, Ed J. Kilpatrick, Chief, Real Estate Division, Department of the Army, Vicksburg District, United States Corps of Engineers.

Nos. 78–1034, 78–1050.

United States District Court,
W. D. Arkansas,
El Dorado Division.

March 26, 1980.

On the Merits Jan. 30, 1981.

---

Joseph W. Gelzine and John P. Gill, Mitchell, Williams, Gill & Selig, Little Rock, Ark., for plaintiffs.

Larry McCord, U. S. Atty., J. Michael Fitzhugh, Asst. U. S. Atty., Fort Smith, Ark., and Dorothy R. Burakreis, Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION

ROY, District Judge.

These two cases, which were consolidated for trial purposes, concern the Felsenthal National Wildlife Refuge. Congress authorized the Felsenthal National Wildlife Refuge in Section 118 of the River and Harbor Act of 1970, P.L. 91–611, approved on December 31, 1970. The authorization modi-

fied the existing Ouachita and Black Rivers Navigation Project (River and Harbor Act of July 14, 1960, P.L. 86–645) as follows:

The project for the Ouachita and Black Rivers, Arkansas and Louisiana, authorized by the River and Harbor Act of 1960, is hereby modified to provide for the acquisition of lands for establishment of natural wildlife refuges, under the provisions of Public Law 85–624 and Section 6(c) of Public Law 89–72, at an estimated additional Federal cost of $13,500,000, substantially in accordance with the report of the Chief of Engineers dated November 5, 1970, subject to approval by the Secretary of the Army and the President.

The President approved the project on April 19, 1971 and the Secretary of the Army approved it on May 4, 1971.[1] The report of the Chief of Engineers provides for the acquisition of approximately 65,000 acres of land to be dedicated as a wildlife refuge. House Document No. 92–109 was the original environmental impact statement for the Felsenthal National Wildlife Refuge. This environmental impact statement was later updated by an environmental impact statement filed in December of 1974 for the entire Ouachita-Black Navigation Project, of which the refuge is a part. A programmatic environmental impact statement has been filed for the entire system of national wildlife refuges. *See, Sierra Club v. Andrus*, 581 F.2d 895, 897 (D.C. Cir.1978).

Plaintiffs herein own or lease portions of a 235-acre tract which has been described as a "fishing camp" or "resort area." A condemnation action was filed by the defendants against this property in 1978 and plaintiff Hogan filed the instant action in May of 1978 and the other plaintiffs filed in July of 1978. Plaintiffs have cited the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, as the jurisdictional basis for this lawsuit. They have alleged that the Corps of Engineers has not fulfilled the procedur-

al requirements of this Act in its preparation of the environmental impact statements which specifically concern the refuge. The plaintiffs are not attempting to prevent the construction of the Ouachita and Black River Navigation Project as such. They obtained a stay of the condemnation proceedings pending the outcome of this case, but only the establishment of the Felsenthal National Wildlife Refuge which was purportedly authorized as mitigation lands because of the establishment of the navigation project was at issue.

■ The defendants sought and the court granted a separate hearing on its affirmative defense of laches. A one-day trial limited to this issue was held September 12, 1979. The defendants have the burden of proving the affirmative defense of laches.[2] This is a very heavy burden. In *Organizations United for Ecology v. Bell*, 446 F.Supp. 535, 546 (M.D.Pa.1978) the court stated:

The Defendants must meet three independent criteria before the equitable doctrine of laches can be applied. First, the Defendants must show a delay by the Plaintiffs in asserting a claim. Second, they must establish that the delay was not excusable. Third, they must show that there is undue prejudice to the party against whom the claim was asserted.

■ At trial, defendants introduced evidence showing that three of the plaintiffs, Mrs. Louise McCall Hogan, Mr. Russell Marks, and Mr. Proctor Evers, attended a public meeting held by the Corps of Engineers on August 22, 1973 in the Union County Courthouse in El Dorado, Arkansas. At this public meeting the purposes and objectives of the refuge were discussed, and a question-and-answer session was held. Defendants also introduced evidence that twelve articles concerning the refuge appeared in the El Dorado News and five appeared in Crossett News Observer during

---

1. House Document No. 92–109, 92nd Congress, 1st Session, vii, v–vi.

2. The answer of the defendants alleged that the complaint is barred by the equitable doctrine of laches in that its filing has been unreasonably delayed to the prejudice of defendants.

the period from November 1970 through February 1973.

The defendants' position is that the plaintiffs knew of the project at least as early as the 1973 public meeting and did not file their complaints until 1978 and that the delay was not excusable.

The plaintiffs contend first that there was no delay in seeking relief as soon as practicable after definite information concerning the project became available. Furthermore, they strongly urge that if the court does find any delay on the part of plaintiffs it was excusable since the delay, if any, was caused by defendants' agents furnishing inconsistent, inaccurate, and incomplete information to plaintiffs' inquiries.

Although the public was told the boundary lines were definite at the August 23, 1973 meeting, the proof indicated the boundaries were changed at least three times thereafter. The record reflects that the individual landowners were led to believe there would be exceptions from the boundary lines as drawn at that time and that each case would be considered separately.

If plaintiffs did delay in asserting their rights, that delay was excusable in light of the above described facts because it was reasonably assumed that the plans for the Refuge were not final and that the parties would be notified when they did become final. Temporary plans or plans which are not final ordinarily are not subject to injunctive action.

From the testimony and exhibits the court makes the following Findings of Fact and Conclusions of Law:

(1) William Hogan, son of plaintiff Mrs. Hogan, testified that Colonel Reece promised in the 1973 meeting to contact affected landowners following the public meeting.

(2) No contact was made by the Corps of Engineers between 1973 and November 1977. The November 1977 meeting with the Corps was initiated by Mr. Hogan, and not the Corps of Engineers. The testimony at the hearing revealed that congressional appropriations were not available for acquisition of the plaintiffs' lands until 1976, three years after the first public meeting. The testimony of the government's witnesses revealed that, notwithstanding that this long period had elapsed, no subsequent meetings were scheduled or held by the Corps concerning specifically the issue of acquisition until 1977.

(3) Mrs. Hogan received a letter in 1976 stating that acquisition of the lands for the Refuge (and therefore, presumably construction of the Refuge) would not be accomplished due to lack of funds. The Corps of Engineers made no effort to keep leaseholders advised as to the modifications and rescheduling of the government's acquisition plans. The testimony established that the project was subject to an executive moratorium under the Nixon administration whereby public works projects were suspended for budgetary reasons. Likewise, Russell Marks, one of the lessees, was advised by H. K. Thatcher, Executive Director of the Ouachita River Valley Association, that Congress had not yet decided whether to appropriate the necessary funds to complete land acquisitions for the Felsenthal Refuge.

The executive moratorium on public works, together with the inability to get full congressional appropriations, would allow those hoping to retain their leasehold interests or otherwise opposing the project to expect the project would fail. This expectation and hope was logically supported by the inaction of the Corps and its continuing silence. It would be extraordinary for any individual to file suit against the government to stop the refuge acquisition at a time when those acquisition plans were unfunded, frozen by executive moratorium, and apparently abandoned by the Corps.

(4) The boundaries of the project described in the 1973 meeting were represented to be permanent whereas, in fact, the boundaries of the project were changed in at least three particulars. This uncertainty increased the difficulty for the parties to determine the nature of the project, which was essential before an attack could be made on its legality.

(5) Since plaintiffs thought the plan was still in the preliminary stages, Mrs. Hogan and the lessees made improvements on the property.

(6) There was no activity evidenced in the area of the Wildlife Refuge by the U. S. Fish & Wildlife Service until late 1977.

(7) The construction of the dam is in a very isolated and remote location which cannot be seen from the river.

(8) Grit Robinson testified that according to the White House press secretary that the dam project was "under review" as late as May 12, 1977.

(9) Two agents for the defendants, on two separate occasions, gave Mr. Hogan the four-page 1971 Environmental Impact Statement in response to his request for Environmental Impact Statements. Both requests were answered after the 1974 "official" Environmental Impact Statement had been prepared.

(10) No Environmental Impact Statements were distributed at the 1973 meeting.

(11) The 1974 official Environmental Impact Statement was not furnished the plaintiffs until sometime in 1979.

(12) The programmatic Environmental Impact Statement was not furnished until late August 1979, after this action was filed in May 1978.

(13) Russell Marks, one of the other plaintiffs, testified that defendants' agent, Wallace Hubbard, stated in 1977 that the problem of the Hogan property would have to be addressed in the future.

(14) Mr. Marks also testified that another Corps' agent, Fred Dizel, stated about this same time that everything possible would be done to keep from acquiring the Hogan property.

(15) Mr. Hogan testified of his utter frustration because of repeated unsuccessful efforts to obtain information concerning the establishment of the Wildlife Refuge. Seven or eight different government officers or employees refused to provide information or gave evasive answers to all of his questions.

Mrs. Hogan was advised by letter on April 20, 1978 that eminent domain proceedings were being recommended to acquire her property for the Refuge and that the purpose of the letter was to notify the tenants of the tract of land in question that they had 90 days to vacate the property. Plaintiff Hogan filed her lawsuit on May 24, 1978 and the lessees filed their action July 10, 1978.

The court finds that under the circumstances of these consolidated cases there was no undue delay in plaintiffs' filing the actions, and the affirmative defense of laches plead by the defendants will be stricken from the answer. An order to this effect will be entered on this date.

## ON THE MERITS

The Court outlined the history of the Felsenthal National Wildlife Refuge and the position of the parties in a memorandum opinion filed March 26, 1980, in these consolidated cases. Therefore, it will not be necessary to detail these facts again.

After a previous hearing and granting plaintiffs' motion to strike the defendants' affirmative defense of laches, the Court set these consolidated cases for trial on the merits of the plaintiffs' complaint. Briefs in connection with the 3-day trial record have now been filed with the Court and the case is ready for decision.

The plaintiffs have requested that the Court grant appropriate declaratory relief based upon two main contentions:

(1) That defendants have failed to comply with the provisions of the National Environmental Policy Act (NEPA) by failing to prepare a "detailed statement" of the environmental impact of the Felsenthal National Wildlife Refuge Project as mandated by 42 U.S.C. § 4332(2)(C); and

(2) That defendants have failed to comply with the provisions of the Endangered Species Act of 1973 (ESA), specifically 16 U.S.C.A. § 1536.

We now review the record in connection with plaintiffs' contentions.

As indicated in our prior memorandum opinion, a programmatic environmental impact statement has been filed for the entire system of national wildlife refuges and the U. S. Court of Appeals for the District of Columbia Circuit has described this programmatic statement as satisfactory. *Sierra Club v. Andrus*, 581 F.2d 895, 897 (D.C. Cir. 1978), *rev'd* (on other grounds), 442 U.S. 347, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979).

More recently, the Fish and Wildlife Service (FWS), Department of the Interior, which is charged with the responsibility to manage the Felsenthal Refuge, has prepared and approved a Wildlife-Timber Management Plan for the Refuge to comply with the guidelines furnished by the programmatic environmental impact statement. In response to a letter from the Corps of Engineers dated December 12, 1978, requesting formal consultation, FWS issued a biological opinion dated December 29, 1978, concerning possible effects on endangered species resulting from acquisition of lands by the Corps to establish the Felsenthal Refuge. FWS concluded in this opinion "that completion of this land acquisition project will promote the conservation of those listed species occurring within the area."

Numerous archeological surveys have been conducted over the years in the Felsenthal Refuge under contracts with the Corps and FWS. FWS has recently requested comments from the State Historic Preservation Officer on a draft report entitled "A Cultural Resources Reconnaissance of the Felsenthal National Wildlife Refuge, Arkansas," pursuant to 36 CFR part 800.-4(a). The Corps expects to complete its cultural surveys of areas within the navigation pool and begin the consultation process by the summer of 1981.

The project has remained at approximately 65,000 acres since its approval in 1970; the boundaries have been altered around the periphery only, and these changes have not been substantial.

As of the date of the laches hearing, approximately 64,490 acres had been ac-

quired for the Refuge, with 480 acres remaining to be acquired. Thus, acquisition was then 99 percent complete, representing the expenditure of about $12,500,000 for the total real estate interest acquired along with relocation benefits. Environmental Impact Statement (EIS), House Document No. 92–109, consists of the entire document presented to Congress which authorized the Corps to proceed with the project. Fundamental parts of this environmental analysis include: the letters of comment and recommendation from the various federal and state agencies, the letter of the Chief of Engineers, and the letter from the FWS dated August 1, 1969.

The proposed federal action, which is the subject of the 1970 environmental analysis, is described in detail in the FWS letter of 1969, setting forth the Department of the Interior's recommendation that 65,000 acres of land and water area at Felsenthal Lock and Dam be acquired in fee to be made available for management as part of the National Wildlife Refuge System. An integral part of the Refuge is a fish and wildlife pool to be created on a seasonal basis by raising water levels from 65 feet mean sea level (the level of the new navigational pool) to 70 feet mean sea level, temporarily flooding approximately an additional 24,000 acres.

The navigation project authorized in Senate Document 112, 86th Cong., 2d Sess., approved July 14, 1960, would increase the height of the existing navigation pool 3.4 feet and flood an additional 10,000 acres, resulting in a total of approximately 15,000 acres permanently flooded at elevation 65 feet m.s.l. With the fish and wildlife pool at elevation 70 feet m.s.l. a total of nearly 39,000 acres would be flooded.

The seasonal flooding of nearly 24,000 acres of hardwoods during the dormant season would significantly improve waterfowl habitat and enhance the value of the navigation project not only for waterfowl but also for fishing and other recreational purposes. Acquisition of lands for the Refuge would also preserve a significant acreage of hardwood forest lands of value to migrato-

ry birds and resident wildlife species in an area where extensive clearing activities threatened to eliminate an important ecological type.

The general management plan proposed in House Document No. 92–109 was to gradually flood the fish and wildlife pool in the fall to reach elevation 70 feet by mid-December and maintain that level until approximately mid-May. The plan provided that "management will be flexible enough to assure the greatest benefits to migratory waterfowl." Historically, these bottomlands have been flooded 72 feet to 73 feet m.s.l. on an almost annual basis and periodically to much higher.

The discussion of alternatives to the proposed action included no-action and purchase merely of easements rather than fee title. It was determined, however, that easement rights:

do not provide the opportunity to manage the land and timber for maximum benefit, nor provide protection for existing highly valuable habitat. Rights in easement do not provide protection against clearing, grazing or other land-use practices adverse to wildlife, and will make difficult or obstruct the full protection and development of recreational scenic and wildlife resources.

On the other hand, benefits of the proposed action, acquisition in fee, were substantial as noted in particular in the FWS letter and throughout the House Document. In summary, it was determined that acquisition in fee title of the land for the fish and wildlife pool would:

result in substantial wildlife benefits as indicated in the table, in addition to other intangible and monetary benefits. Fee title would protect against clearing and erosion of the lands and possible siltation of the navigation pool. Public ownership and management would also enhance the project area for endangered species of wildlife such as the American alligator and the southern bald eagle.

The adverse impact noted was that a substantial amount of additional acreage of private land holdings would be changed to public ownership.

The comments from interested state and federal agencies, attached as an integral part of the environmental statement, indicate that the statement adequately describes the environmental aspects of the proposed project. No changes other than minor editorial changes were recommended.

The 1974 final impact statement evaluates the environmental impacts of a plan of improvement along an existing navigation channel in the Black and Ouachita Rivers extending from the mouth of the Black River in Louisiana to Camden, Arkansas. The proposed improvements consist of: deepening the navigation channel to provide a minimum depth of 9 feet on a bottom width of 100 feet; construction of new 84–foot by 600-foot locks and new dams at Felsenthal and Calion, Arkansas; channel realignment on the Ouachita River; a 5-foot seasonal fish and wildlife pool superimposed on the Felsenthal navigation pool; and the establishment of a 65,000 acre National Wildlife Refuge in connection with the Felsenthal Lock and Dam and an 18,000 acre Refuge in connection with the Columbia Lock and Dam.

There is no substantial difference in the general plan of operation of the seasonal fish and wildlife pool described in the 1974 EIS than that described in the original EIS. In the actual operation of the dam by the Corps, the releases would be based on a rule curve to be mutually agreed upon by the States of Arkansas and Louisiana, the United States Fish and Wildlife Service and the Corps. It is noted that studies indicate that maintaining the pool at elevation 70 feet m.s.l. during this period would cause little or no additional flood damage, since water levels are frequently at or above this elevation as a result of natural spring and summer flooding.

In the preparation of the 1974 EIS, the National Register of Historic Places was consulted, and lists four National Register properties located in the Arkansas portion of the basin (none in the Refuge, however). The State Archeologists in both Arkansas

and Louisiana were consulted. The EIS further notes that archeological studies were underway for the Felsenthal portion of the project and that evaluation of archeological resources would be coordinated with the State Archeologist. It is also noted that the proposed action would not adversely affect any known historic, natural or environmental education sites eligible for the National Landmark Program.

The 1974 EIS is sufficiently detailed to alert decision makers to the environmental consequences of the proposed action. The benefits of the navigation project, summarized in the EIS and in the Statement of Findings, include: industrial growth and development along the Ouachita River as a result of improved navigation, increased recreational use, and, most importantly, benefits to fish and wildlife resources, including endangered species, as a result of the creation of the Refuge.

On the other side of the scale, the EIS fairly identifies the adverse impacts. These are the reduction in the amount of bottomland forest resources as a result of permanent impoundment to the 65-foot level of the new navigation pool; the loss of stream habitat; the increase in sediment and turbidity levels as a result of land disturbances at construction sites and annual maintenance dredging; the subsequent impacts on fishery resources, water quality and aesthetic values; and creation of additional sources of pollution by the increased navigation activity and probable industrial expansion.

The Corps, after considering a reasonable range of alternatives, concluded that no alternatives would accomplish all of the objectives of the proposed action.

Since the project affects water uses relating primarily to fish and wildlife propagation and recreation, most of the coordination and data inputs were from fish and wildlife agencies. The various letters and reports of the FWS or Bureau of Sport Fisheries and Wildlife are described and summarized in the final EIS and constitute a part of the EIS.

The evidence adduced through various Government and expert witnesses, as summarized below, indicates that the Corps prepared both the original EIS in 1970 for the acquisition of lands for the Refuge and the subsequent EIS in 1974 for the entire navigation project, of which the Refuge is a part, with "good faith objectivity." The resulting environmental analyses along with all the supporting documentation permitted a decision maker at the time these decisions were made to fully consider and balance environmental factors.

The FWS is charged with management and operation of the Refuge. Subsequent to the Corps' 1974 final EIS, FWS has prepared: a final environmental impact statement for the operation of the National refuge system; the Felsenthal Wildlife Timber Management Plan, which implements on a site-specific basis the refuge system objectives and guidelines stated in the FWS final environmental impact statement; and an environmental assessment of proposed development in the Refuge. These environmental analyses by FWS provide additional support for defendants' implementation of the Congressional decision to create the Refuge.

Management objectives of the Felsenthal Refuge are: (1) to enhance and to protect 64,975 total acres of habitat for wildlife and to manage intensively 39,285 of these acres of bottomland hardwood wildlife habitat; (2) to manage and develop 21,934 acres of bottomland hardwoods as a green-tree reservoir for wintering waterfowl; (3) to provide and manage for a full spectrum of native fauna and flora, especially endangered or threatened species; and (4) provide wildlife oriented recreation, education and interpretive opportunities.

The hydrology and hydraulic design for the Felsenthal Lock and Dam and related features are contained in Design Memoranda 20 and 22. Natural flooding frequencies are described in the original EIS. The result of flood frequency studies is also summarized in the 1974 EIS.

The Corps has neither the authority nor the physical capability to operate the fish

and wildlife pool above elevation 70 feet. The operation of the fish and wildlife pool at elevation 70 feet m.s.l. will not increase natural flooding above that elevation.

Nolan Raphelt, a hydraulic engineer with extensive experience in the design and operation of navigation projects and the routing of flows through reservoirs, testified that the lock and dam is designed to pass flood flows, e. g., flows that would naturally cause the river to be above pool stage, at the same elevation as flows would have been prior to construction of the structure.

The Felsenthal Lock and Dam has the capacity to perform the drawdown of the pool from elevation 70 feet m.s.l. to elevation 65 feet m.s.l. in 10 days when natural conditions allow. If conditions did not allow for this drawdown, the structure is sized so that the drawdown can be accomplished with the natural fall of the river from elevation 70 feet m.s.l. to elevation 65 feet m.s.l.

In the upper part of the pool, the 70-foot pool is closely confined to the river because of the natural topography of the land, sloping downward as the river slopes downward. The elevation of the top bank approaches 80 feet m.s.l. at the upper end of the pool, whereas it is down to elevation 65 or 66 feet at Lock and Dam 6 or the new lock and dam. Thus, the blue area on the tri-colored map of the Refuge is greater in the lower portion just behind the new structure because there the top of bank is lower, as the natural topography and river drains downhill. (Def. Exhibit 11.)

The Corps now has only a design plan of operation. The design can accommodate a different operational procedure. The Corps is participating in the development of a specific water level management plan based upon the most up-to-date scientific data available.

At the time the EIS for the entire navigation project was prepared in the period 1973–1974, the only scientific paper available that addressed directly green-tree reservoir management and its effect on bottomland hardwoods was W. M. Broadfoot's 1967 paper, "Shallow Water Impoundment Increases Soil Moisture and Growth of Hardwoods." It represents a thorough scientific report on the results of eight years of research. In general, the results indicated that for that period of time and for the species involved water could be held on hardwoods in clay soil from the fall until July 1 without damaging the trees. In fact, in that situation the growth of all species (mainly the same as those found in Felsenthal) was increased.

In 1973–1974 there was no other scientific literature directly relating to the management of green-tree reservoirs. There were merely recommendations that had been developed from the research and from observations.

Sid McKnight, an eminent forester with excellent credentials in research and practice of forest management, including green-tree reservoirs, generally agreed with the 1974 EIS assessment of damage to hardwoods as a result of permanent impoundment at elevation 65 feet m.s.l., but considered the EIS estimate of damage above 65 feet m.s.l. too high. Damage would be limited by the fact that in clay soils there is not the problem with raised water tables that there would be in soils that have normal capillary action. Impoundment at 65 feet m.s.l. would improve the growth of trees at elevation 68 feet m.s.l.[1]

Witness McKnight also agreed with the 1974 EIS statement that the raised fish and wildlife pool will have little effect on timber growth. In fact, there would be some benefit to species above the 72-foot level, particularly pines because of the moisture available to the root zone during the growing season. However, he did testify the fish and wildlife pool would be removed as early in the spring as possible.

The pine stands start at about the 73-foot elevation in the middle of the Refuge or 3

1. Although there was some testimony to the contrary, the Court finds Mr. McKnight's testimony more credible.

feet above any elevation that defendants will control at Felsenthal Lock and Dam. Holding the pool at elevation 70 feet m.s.l. until mid-May would increase the growth of those pine trees at 72–73 feet because it would make water available to them on what are considered drier sites during the periods of growth. Thus, the fish and wildlife pool would be of some benefit to redcockaded woodpecker habitat.

Dr. Luther Holloway was a research botanist with the Corps during the years 1973 to 1977. Prior to that time he served as an environmental resources specialist preparing environmental impact statements for the Corps during the period 1972–1973. Dr. Holloway testified that the standard practice at the time he prepared such statements was to study the available literature for a particular area, review studies that had been done in the past that might be analogous to that particular situation, and use all the data in preparing the impact statement. It was also his practice to look over the area and to become familiar with the particular community.

In the preparation of the 1974 EIS, the Corps' environmental specialist personally inspected the Felsenthal basin and considered the available historical and scientific data.

Dendrophydrological studies, the use of water on plant growth relating the annual growth in tree rings to the presence of water, were conducted by Dr. Dan Sistrunk on 45 samples taken in the Felsenthal Refuge, with two cores from each tree. In the particular data gathered to date, a comparison of the cumulative samples of trees growing below the 70-foot level with those growing above that level showed that the trees growing between elevations 65 and 70 were growing at a higher rate than those trees between the 70- and 75-foot elevations. A similar study was conducted by Dr. Sistrunk in the area of the Delta National Forest, a green-tree reservoir, where both the tree species and soil make-up were similar to those factors in Felsenthal. The growth data showed that during the 20 years since the green-tree reservoir had

been in operation, the radial growth of the trees has been greater than the 20 years prior to its operation.

Dr. Sistrunk's findings in Felsenthal represent initial findings; more studies are planned. To date these studies indicate that the natural flooding has benefited the trees growing in the area. It is not necessary to review all the testimony of the various witnesses concerning the forestry and plant communities but it tended to support the sufficiency of the EIS.

Robert Jenkins, Director of the National Reservoir Research Program, Fayetteville, Arkansas, since 1963, and past President of the American Fisheries Society, testified with regard to impacts of the navigation project on fisheries resources. His preeminent credentials in the field of reservoir research and fish productivity were recognized by Dr. William Lewis who was plaintiffs' expert on fisheries.

The standing crop data from Felsenthal indicate that the productivity is high with respect to commercial and sport fisheries— around 700 pounds per acre. A high proportion of this total crop is in gizzard shad, buffalo fishes, and bullfin, but there are also good populations of large-mouth bass, crappie, sunfish, and catfish. Spotted bass were present in one sample in 1978, 4.6 pounds per acre. Spotted bass have been observed spawning at depths of up to 20 feet.

No federally-listed endangered fish species are present within the Refuge. The endangered or threatened species referred to by Dr. Lewis appear only on the state list, not the federal list.

The shoreline length at elevation 61.6 feet is 150 miles; at 65 feet the shoreline length is 210 miles. Thus, there is a 40 percent increase in shoreline length at the new permanent navigation pool elevation of 65 feet. The significance is that this increases the total length of shoreline available to smaller fishes that are in shallow water, both inhabitants and spawners, providing them with an increase in habitat for protection and cover.

There is an overall increase in aquatic habitat of 9,500 acres from a water surface of elevation 61.6 to an elevation of 65 feet. There would not be any great change in present species composition.

As to an increase in fish predation, which was noted in the 1974 EIS, the permanent raise of 3.5 feet to 65 feet would require a period of adjustment to reestablish the typical aquatic vegetation zone to develop; however, the inundation will also add terrestrial vegetation to the cover available—brush, bushes, standing and falling trees—which should provide a great deal of protection in the 3.5 foot zone of 9,500 surface acres. It would indeed improve sport fishing. There will not be a loss in habitat diversity, with all the backwater north of the Highway 82 bridge that will be provided.

Seventy-five to 80 percent of ducks within the Refuge are mallards. Woodducks constitute approximately 10 to 15 percent of the duck population present. Teal are there in only limited numbers, representing 3 to 5 percent of the waterfowl population. Seasonal impoundment of the fish and wildlife pool will benefit target species, mallards and woodducks, by putting water on the areas in a depth at which they can be feeding at the time they are there during the winter.

The contention has been made that this project will have an adverse effect upon the red-cockaded woodpecker. The red-cockaded woodpecker requires for nesting purposes living, matured or over-matured pine trees infected with the red heart disease. This condition primarily exists in pines at least 60 to 70 years old.

We have previously observed that operation of the fish and wildlife pool will have no negative effect on pine stands. In fact, if maintained until mid-May, there would be a beneficial effect in having moisture available to the root zone during the growing season. Thus, operation of the fish and wildlife pool would benefit the red-cockaded woodpecker.

To further assure conservation of the red-cockaded woodpecker, the Felsenthal timber management plan provides for an 80-year rotation in the pine stands in 10,000 acres. Furthermore, the hardwood growth under the pines will be controlled. These measures not only meet but exceed the recommendations of the red-cockaded woodpecker recovery team.

The Biological Opinion notes that the subspecies of the eastern cougar possibly inhabiting the area of Felsenthal would likely be the Florida panther, *felis concolor coryi*. However, there are no recently confirmed reports of any cougars within the acquisition area.

In the opinion of Mr. Neal, FWS biologist dealing with Section 7 consultations under the Endangered Species Act, there is no reliable evidence of a cougar population within the Felsenthal area. The Court finds this testimony credible and no substantial evidence to the contrary.

Plaintiffs have also expressed concern about the effect of the Refuge on alligators. Since there is a net increase in the aquatic system at elevations 65 and 70 feet, there would be an increase in food supply, and thus an increase in the alligator population; an additional benefit would be an increased level of law enforcement and protection.

As to eagles, they tend to follow concentrations of waterfowl such as wintering mallards. Eagles are good scavengers, preying upon sick or wounded birds. The net increase in fish in the area as a result of the project would, like waterfowl, add to the food supply for the eagle.

On balance, even though there is a risk that waterfowl hunters may shoot eagles, the FWS enforcement along with the waterfowl sanctuary and increase in food supply would provide a net benefit.

Further studies are being made as to archeological surveys. The report summarizes three seasons of field work—1972, 1973, and 1975—and notes that most of the sites identified are at or above elevation 75 feet m.s.l.

A draft report on the results of an archeological survey of areas to be affected

by proposed construction projects has been submitted to the State Archeologist for comment.

As a general rule, inholdings are avoided in National Wildlife Refuges. The original EIS discusses the very limited human habitation within the boundaries of the then proposed Refuge, as well as the adverse impact of changing private land holdings to public ownership. It also addresses the rationale for fee acquisition. The only persons identified by plaintiffs' witness, Mac Hogan, as residing permanently within the Refuge are Messrs. Poole and Walden. The Court notes that both have wives in permanent residences in El Dorado.

Uncontradicted expert witness testimony shows that most of Hogan property lies below elevation 70 feet m.s.l. One-third of the 234.55 acres in the tract is below the 65-foot elevation, and two-thirds of it is within the 67-foot elevation. Only about 35 acres lie above elevation 70 feet m.s.l.

Deer and furbearers such as coons, nutria, and beaver, have been displaced from the Refuge historically by natural flooding. Although trapping is not discussed per se, the 1974 EIS recognizes that the navigation and fish and wildlife pools will reduce habitat for terrestrial furbearers, resulting in an overall adverse impact on the furbearers of the Refuge.

The EIS indicates a loss of 16,000 acres in lowland forest which would result in its loss as a source of timber products. Conversely, the project will provide recreation needs of the public and economic growth in the industries requiring waterfront and/or waterborne transportation. These industries would result in an increase in job opportunities, thus offsetting losses in employment in the timber products industry.

The wildlife pool, at elevation 70 feet m.s.l., will impound water in the lower reaches of the Saline River. Since the impact of this flooding would be similar to impacts on the Ouachita River, there was no separate discussion and analysis except in the context of the operation of the entire navigation project and the Felsenthal National Wildlife Refuge. Moreover, at stages of 70 feet and above, many of the features of the Ouachita would merge with the Saline.

The fact that chlorides in Ouachita exceed those in Saline River is irrelevant. The two rivers now merge, and to the extent the water quality in Saline is degraded by that merger, that result will be the same in the future. There is, however, ample discussion of water quality in the 1974 EIS.

There is also detailed discussion as to the increase in annual visitation to the Refuge in the 1974 EIS as well as the impacts thereof.

Authorization for the Felsenthal Wildlife Refuge preceded enactment of the Endangered Species Act of 1973, 16 U.S.C. § 1531 et seq., by three years. However, consultation with the FWS did occur as required by the Fish and Wildlife Coordination Act, 16 U.S.C. § 661 et seq., and the National Environmental Policy Act (NEPA), 42 U.S.C. 4321 et seq.

The 1970 EIS specifically stated that resident wildlife, both game and nongame, would benefit from assured retention in their natural habitat through establishment of this Refuge. This EIS was commented upon by the FWS in a letter dated July 6, 1970. The Report of the Bureau of Sport Fisheries and Wildlife dated August 1, 1969, stated that the fish and wildlife pool would significantly enhance the value of the navigation project for waterfowl and that acquisition in fee title of the land for the pool would result in substantial wildlife benefits. The report further states that public ownership and management would also enhance the project area for endangered species of wildlife such as the American alligator and the southern bald eagle.

The Corps' 1974 final EIS also addressed endangered species, stating that the American alligator and the red wolf are found in the Ouachita-Black River Basin. The southern bald eagle was noted as a migratory species, and the red-cockaded woodpecker was noted to occur in the basin in Arkansas. The 1974 EIS states that the American alligator and bald eagle would be bene-

fited by the Refuge, and that the red wolf and red-cockaded woodpecker could also be benefited by the Refuge.

On December 29, 1978, the Biological Opinion of the FWS was issued to the effect that completion of the land acquisition for the Refuge "will promote the conservation of those listed species occurring within the area." All facets of the activity under consultation were considered.

The Biological Opinion indicates that the ivory-billed woodpecker and the fat pocketbook pearly mussel do not inhabit the Refuge and plaintiffs have conceded this.

Trial testimony by FWS biologists and outside experts supports the conclusion of the Biological Opinion that none of the listed species found within the Refuge are adversely affected by the Refuge; that all, in fact, are benefited by the Refuge, of which the stated purpose from the very beginning was to preserve a unique waterfowl and hardwood habitat, particularly for endangered species.

Plaintiffs have failed to show that the Biological Opinion of the FWS is arbitrary and capricious. Indeed, its conclusions are well founded, based upon adequate data and supported by the latest biological and ecological data for those endangered species present within the Refuge.

Plaintiffs also appear to challenge the substantive decision by Congress in 1971 to acquire 65,000 acres for the creation and operation of the Refuge on the basis of the 1970 environmental analysis in House Document No. 92–109, as well as the adequacy of a subsequent environmental analysis which the Corps prepared in connection with implementation of the Congressional decision on the Refuge. Subject to specific Constitutional limitations, when the legislature has spoken, "the public interest has been declared in terms well-nigh conclusive." *Berman v. Parker*, 348 U.S. 26, 33, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954). Hence, the role of the judiciary in determining whether the power of eminent domain is being exercised for a public purpose is an extremely narrow one. The court cannot determine whether a particular project is a desirable one. The need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch.

Accordingly, in *Environmental Defense Fund v. Corps of Engineers*, 492 F.2d 1123, 1127 (5th Cir. 1974), the Fifth Circuit affirmed the district court's refusal to review the merits of the Corps' determination to proceed with the Tennessee-Tombigbee Waterway project "since that determination, although normally subject to review under the Administrative Procedure Act, has been superseded by a congressional decision that the waterway should go forward, which was made after a legally sufficient environmental impact study had been filed and debated."

The court's role upon review of the adequacy of an EIS under § 102(2)(C) of NEPA is also circumscribed. The Supreme Court in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 555, 558, 98 S.Ct. 1197, 1217, 1219, 55 L.Ed.2d 460 (1978), held that NEPA's mandate is "essentially procedural," and emphasized that

> The role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one, limited both by the time at which the decision was made and by the statute mandating review.

The Court reiterated its observation in *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21, 96 S.Ct. 2718, 2730 n.21, 49 L.Ed.2d 576 (1976), that:

> Neither the statute nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions.

■ In reviewing compliance with the procedural provisions of NEPA, the Eighth Circuit has held that the test is one of "good faith objectivity." The "discussion of environmental effects and alternative courses of action need not be exhaustive." *Minnesota Public Interest Research Group v. Butz*, 541 F.2d 1292, 1300 (8th Cir. 1976), *cert. denied*, 430 U.S. 922, 97 S.Ct. 1340, 51

L.Ed.2d 601 (1977). NEPA, construed in light of a rule of reason, requires that the EIS contain "only sufficient information to permit a reasoned choice among alternatives." *Id. NRDC v. Morton,* 458 F.2d 827, 837 (D.C. Cir. 1972). Moreover, "the framing of alternatives in the EIS is committed to the discretion of the responsible agency." *North Slope Borough v. Andrus,* 642 F.2d 589 at 604 n. 84 (D.C.Cir. 1980); *NRDC v. NRC,* 606 F.2d 1261, 1271–72 (D.C.Cir. 1979). Most recently, the Supreme Court has reiterated that:

Court has reiterated that:

> ... once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to ensure that the agency has considered the environmental consequences; it cannot "interject itself within the area of the discretion of the executive as to the choice of the action to be taken."

*Strycker's Bay Neighborhood Council, Inc., v. Karlen,* 444 U.S. 223, 227, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1980) (quoting *Kleppe v. Sierra Club, supra,* 427 U.S. at 410 n. 21, 96 S.Ct. at 2730 n. 21).

In reviewing the Corps' implementation of the Congressional decision to acquire land for the creation and operation of the Refuge, the court "need not limit itself to any single environmental analysis, but may review the administrative record available to the agency when it reached its decision." *Get Oil Out, Inc., v. Andrus,* 447 F.Supp. 40, 43, 13 ERC 1474, 1477 (D.C.Cal.1979). See *City of New Haven v. Chandler,* 446 F.Supp. 925 (D.Conn.1975). See, also, *North Slope Borough v. Andrus, supra,* at 601–603 rev'd, 486 F.Supp. 326 (D.D.C. 1979).

The evidence presented at trial shows that the Corps prepared both the original EIS in 1970 for the acquisition of lands for the Refuge and the subsequent EIS in 1974 for the entire navigation

project, of which the Refuge is a part, with "good faith objectivity"; that the alternatives considered and the amount of detail were appropriate to the nature of the decision to be made, especially in view of the long-term nature of the project and the continuing control of defendants over all stages of development; and, further, that the resulting environmental analyses along with all the supporting documentation permitted a decision maker at the time these decisions were made to fully consider and balance environmental factors.

The original EIS consists of the entire House Document No. 92–109 presented to Congress which authorized the Corps to proceed with the project. *Sierra Club v. Andrus, supra,* 578 F.2d at 394. The proposed federal action, which is the subject of the 1970 environmental analysis, is described in adequate detail in the FWS letter of 1969, setting forth the Department of Interior's recommendation that 65,000 acres of land and water area at Felsenthal Lock and Dam be acquired in fee to be made available for management as part of the National Wildlife Refuge System. An integral part of the Refuge is a fish and wildlife pool to be created on a seasonal basis by raising water levels from 65 feet m.s.l., temporarily flooding approximately 24,000 acres.[2] It was believed that acquisition of lands for the Refuge would preserve a significant acreage of hardwood forest lands of value to migratory birds and resident wildlife species in an area where extensive clearing activities threatened to eliminate an important ecological type. Defendants have shown through ample evidence presented at trial that these assessments were not unreasonable at the time they were made.

It is also noted that "management will be flexible enough to assure the greatest benefits to migratory waterfowl."

The alternatives discussed and extent of detail, as heretofore set out in this opinion,

2. The navigation project authorized in Senate Document 112, 86th Cong., 2d Sess., approved July 14, 1960, would increase the height of the existing navigation pool 3.4 feet and flood an additional 10,000 acres, resulting in a total of approximately 15,000 acres permanently flooded at elevation 65 feet m.s.l. With the fish and wildlife pool at elevation 70 feet m.s.l., a total of nearly 39,000 acres would be flooded.

fully satisfied the "rule of reason" under NEPA at the time the decision was made to acquire the land for creation of the Refuge.

The 1974 EIS is sufficiently detailed to alert decision makers to the environmental consequences of the proposed action. Both benefits of the navigation project and the adverse effects are fully summarized. Trial testimony has amply demonstrated that preparation of defendants' 1974 EIS was consistent with the state of the art at that time.

Plaintiffs have failed to show through credible evidence that defendants' discussions and study of alternatives or environmental impacts—beneficial or adverse— were inadequate or unreasonable at the time of making the decision. The trial evidence clearly demonstrates the adequacy of the EIS, and plaintiffs have failed to show any violations of the NEPA or the ESA.

Accordingly, plaintiffs' complaints are hereby dismissed.