In re Richard Dale BYRD, aka Joe Byrd, Debtor.

In re Gary Wayne RHEA, Debtor.

In re Horace RHEA and Dolly Rhea, Debtors.

In re Steve Lee RHEA and Monique C. Rhea, Debtors.

CITIZENS BANK OF BYHALIA, Plaintiff,

v.

Richard Dale BYRD, aka Joe Byrd; Gary Wayne Rhea; Horace Rhea and Dolly Rhea; and Steve Lee Rhea and Monique C. Rhea, Defendants.

CITIZENS BANK OF BYHALIA, Plaintiff,

v.

GOLDKIST, INC.; Richard Dale Byrd, aka Joe Byrd; Gary Wayne Rhea; Horace Rhea and Dolly Rhea; and Steve Lee Rhea and Monique C. Rhea, Defendants.

GOLDKIST, INC., Plaintiff,

v.

Richard Dale BYRD, aka Joe Byrd; Gary Wayne Rhea; Horace Rhea and Dolly Rhea; and Steve Lee Rhea and Monique C. Rhea, Defendants.

Bankruptcy Nos. S84–30040 to S84–30042, and S84–30044.

Adv. Nos. 84–3086 to 84–3088, 84–3121, 84–3111 to 84–3114, and 84–3138 to 84–3141.

United States Bankruptcy Court, N.D. Mississippi.

Aug. 5, 1986.

John L. Bailey, Cliff Finch & Associates, Batesville, Miss., for Richard Dale Byrd, aka Joe Byrd, Gary Wayne Rhea, Horace Rhea and Dolly Rhea, Steve Lee Rhea and Monique C. Rhea.

Allan Alexander, Patterson, Tollison & Alexander, Oxford, Miss. and D. Rook Moore, Holly Springs, Miss., for Citizens Bank of Byhalia.

William G. Kemp, Kemp and Kemp, Holly Springs, Miss. and John R. Smith, Evans, Petree, Cobb & Edwards, Memphis, Tenn., for Goldkist, Inc.

## OPINION

DAVID W. HOUSTON, III, Bankruptcy Judge.

Came on for consideration the complaint to determine dischargeability filed by Citizens Bank of Byhalia, hereinafter referred to as Citizens Bank, against the Debtors, Richard Dale Byrd, aka Joe Byrd, Gary Wayne Rhea, Horace Rhea and Dolly Rhea, and Steve Lee Rhea and Monique C. Rhea; responsive pleadings having been filed by said Debtors; on consideration of the complaint for damages for conversion of crops filed by Citizens Bank against the Debtors, enumerated previously, and the Defendant, Goldkist, Inc., hereinafter referred to as Goldkist; responsive pleadings having been filed by the Debtors and Goldkist; also on consideration of the complaint to determine dischargeability filed by Goldkist against the Debtors, previously enumerated; responsive pleadings having been filed by the Debtors; all parties being represented before the Court by their respective attorneys of record; on proof presented in open Court; and the Court having heard and considered same finds as follows, to-wit:

### I.

As to each of the complaints filed in the above captioned bankruptcy cases, this Court has jurisdiction of the parties to and the subject matter of these consolidated adversary proceedings pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. The complaints to determine dischargeability are core proceedings as defined in 28 U.S.C. § 157(b)(2)(I). The complaint for damages for conversion of crops is a non-core or related proceeding, but all parties have agreed, pursuant to 28 U.S.C.

§ 157(c)(2), that this Court shall enter final judgment in the proceeding, subject to appeal pursuant to 28 U.S.C. § 158.

## II.

At the trial of these adversary proceedings, Goldkist announced that it would voluntarily dismiss its complaint to determine dischargeability against Gary Wayne Rhea, Dolly Rhea, Steve Lee Rhea, and Monique C. Rhea. This offer of dismissal was approved by the Court, leaving outstanding only the Goldkist complaint against Richard Dale Byrd, aka Joe Byrd, hereinafter referred to as Joe Byrd, and Horace Rhea. At the conclusion of the proof, all Debtors moved for the dismissal of the Citizens Bank complaint concerning the dischargeability of debts, as well as, the complaint for damages for conversion of crops. The Court sustained this motion as to Gary Wayne Rhea, Dolly Rhea, Steve Lee Rhea, and Monique C. Rhea. Therefore, in addition to the Goldkist complaint against Joe Byrd and Horace Rhea, this Opinion deals with the Citizens Bank complaint against Joe Byrd and Horace Rhea, as to the issue of debt dischargeability, as well as, the Citizens Bank complaint against Goldkist, Inc., Joe Byrd, and Horace Rhea, for damages for conversion of crops.

The underlying facts of this case are recited in the following paragraphs.

## III.

In order to plant his 1982 soybean crop, Joe Byrd borrowed the sum of $8,092.92, from Citizens Bank, evidenced by a promissory note and disclosure statement, dated July 23, 1982, being due and payable on November 20, 1982, and bearing interest at the rate of 16% per annum. This promissory note was signed by both Byrd and his father-in-law, Horace Rhea. On the face of the promissory note, there is language indicating that the note is secured by "50 Acres Beans, 10 Acres Beans, 45 Acres Beans, Total 105 Acres Beans" and "1—W & A Hipper with Fertilizer Box Serial No. 4120". There was also the notation that the note was a renewal of notes # 2246,

# 2378, and # 1951. (See Plaintiff's Exhibit 5) The security agreement, applicable to the aforesaid promissory note, was introduced into evidence, reflecting that the note was secured by crops growing or to be grown on the following properties: "50 Acres Beans on Albert Jumper Farm 10 Acres Beans on Glen Tutor Farm 45 Acres Beans on Skin Alexander Farm", as well as, "1—W & A Hipper with Fertilizer Box Serial No. 4120". (See Plaintiff's Exhibit 8) Also introduced into evidence were two UCC–1 financing statements, applicable to the aforementioned promissory note, which indicated that the note was secured by "105 Acres Beans Located in Marshall County". (See Plaintiff's Exhibits 6 and 7) The financing statements, which reflected Citizens Bank as the secured party, were filed with the Secretary of State of the State of Mississippi and the Chancery Clerk of Marshall County, Mississippi. The security agreement and the financing statements were executed exclusively by Joe Byrd.

Although it has little significance on the ultimate decision in this case concerning the claim against Joe Byrd, the Albert Jumper farm set forth in the security agreement should actually have been denominated as the Albert Joiner farm.

When Byrd harvested his 1982 crops, he sold the vast majority of his soybeans to Goldkist in Somerville, Tennessee. Byrd received six checks, payable exclusively to him, totaling $11,447.00. Following a letter from Citizens Bank to Goldkist, advising of the bank's security interest in Byrd's and Horace Rhea's crops, (Goldkist Exhibit 2) Goldkist issued subsequent checks in payment for the soybeans purchased from Byrd jointly to Byrd and Citizens Bank. There were five of these checks totaling the sum of $8,495.45. Therefore, the total of all checks issued by Goldkist to Byrd, and/or Byrd and Citizens Bank jointly, totaled the sum of $19,942.44. Byrd delivered the joint payee checks to Citizens Bank, but the bank officials chose to apply these checks to the debt owed by Horace Rhea, rather than giving Byrd any credit

for the crop proceeds which secured his debt.

The total of the checks delivered by Byrd to the bank was sufficient to pay the principal of his debt plus practically all the accrued interest. As noted hereinabove, the due date of the Byrd promissory note was November 20, 1982. The last check that he tendered to the bank was dated November 22, 1982. Calculated at 16% per annum over a 120 day term, the principal and interest due under the note amounted to $8,518.63. ($8,092.92 multiplied by 16%, divided by 365 days for a per day accrual of $3.55, multiplied by 120 days plus $8,092.92, the original principal amount.) The checks tendered by Byrd to the bank totaled $8,495.45, leaving a shortfall of only $23.18. ($8,518.63—$8,495.45) This rather insignificant amount could well be offset by the pre-payments tendered by Byrd to the bank prior to November 20, 1982. Regardless, this Court will consider this case as if Byrd had tendered sufficient funds to fully satisfy all principal and interest accruing under the note. Otherwise, the Court would be constrained to consider the commercial reasonableness of the sale of Byrd's W & A Hipper by the bank which on the surface appears to be in obvious violation of MCA § 75-9-504. Subsection (3) of that statute states as follows:

> (3) Disposition of the collateral may be by public or private proceedings and may be made by way of one (1) or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms, but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. *Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor,* if he has not signed after default a statement renouncing or modifying his right to notification of sale. In the case of consumer goods, no other notification need be sent. In other cases, notification shall be sent to any other secured party from whom the secured party has received (before sending his notification to the debtor or before the debtor's renunciation of his rights) written notice of a claim of an interest in the collateral. The secured party may buy at any public sale; and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations he may buy at private sale. [emphasis added]

Dudley Moore, the President and Chief Executive Officer of Citizens Bank, testified that the hipper was sold for the sum of $70.00, without notice to Byrd or anyone else. The Court observes that the hipper was new when purchased by Byrd, having a value at that time of between $3,000.00, and $4,000.00. MCA § 75-9-507(1), which is set forth hereinbelow, deals with the secured party's liability for not complying with the Uniform Commercial Code provisions directing that a sale be commercially reasonable, to-wit:

> (1) If it is established that the secured party is not proceeding in accordance with the provisions of this Part disposition may by ordered or restrained on appropriate terms and conditions. If the disposition has occurred the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to the disposition has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this Part. If the collateral is consumer goods, the debtor has a right to recover in any event an amount not less than the credit service charge plus ten per cent (10%) of the principal amount of the debt or the time price differential plus ten per cent (10%) of the cash price.

Since farm machinery is not considered as consumer goods, the 10% charge is inapplicable to this case. However, Byrd could

well be able to recover for his actual losses incidental to his not being advised by Citizens Bank of the hipper sale. The security agreement executed by Byrd in favor of the bank expressly provides that notice would be sent to Byrd regarding the disposition of the collateral upon default. (See Plaintiff's Exhibit 8, paragraph 13) In addition, the secured party has the burden of proving that the hipper was sold "in conformity with 'reasonable commercial practices'", and that the amount received at the sale represented the fair market value of the collateral. See *Walker v. V.M. Box Motor Co., Inc.*, 325 So.2d 905, 906 (Ms.—1976). The foregoing is included herein merely as "food for thought", and will not be considered in the disposition of the bank's claim against Byrd, which will be resolved subsequently in this Opinion.

### IV.

The testimony revealed that Horace Rhea had been in the farming business for approximately thirty years. In 1982, Rhea renewed two previous notes with Citizens Bank. The new consolidated note was in the amount of $61,824.24, and was due with interest calculated at the rate of 16% per annum 150 days from July 23, 1982, the date of execution. Appearing on the face of the note, ostensibly as collateral, was the language, "700 Acres Beans Renewal of Notes # 01924 and # 02582 Chattels". The note was signed by Horace Rhea, Dolly Rhea, Gary W. Rhea, and Steve Rhea. (See Plaintiff's Exhibit 1, Goldkist Exhibit 1) The security agreement, prepared in conjunction with the aforesaid note, attempted to encumber crops of every kind and character, planted or growing, or to be planted or growing within one year from the date of the instrument, on the land described therein. Inserted in the security agreement in an effort to describe the land were the words, "700 Acres of SoyBeans and 100 Acres Corn and other Chattels". This instrument was signed only by Horace Rhea and was dated July 23, 1982. (See Plaintiff's Exhibit 4) The UCC–1 financing statements filed with the Secretary of State of the State of Mississippi and the Chancery Clerk of Marshall County, Mississippi, indicated that they covered "700 Acres of Soybeans and 100 Acres of Corn Located in Marshall County". These financing statements were signed exclusively by Horace Rhea. (See Plaintiff's Exhibits 2 and 3)

The "in court" and deposition testimony of Horace Rhea revealed several interesting facts. Rhea testified that the Farmers Home Administration, hereinafter FmHA, held liens on his crops from previous years that would extend to any crops that he might plant and harvest in calendar year 1982. As such, any security interest in the 1982 crops created in favor of Citizens Bank would clearly be inferior to the security interest of FmHA. Because of the FmHA lien, Rhea stated that he did not farm at all during 1982. Rather, he "assisted" his son, Gary Rhea, his father, J.H. Rhea, and his son-in-law, Joe Byrd, with *their* farming activities. As such, he indicated that no crops were grown in his name, nor were any crops sold in his name. Rhea then testified that he executed the various security instruments in blank, assuming that Citizens Bank would take a security interest in his equipment since the bank officials were aware that he would not be farming in 1982. He indicated that the bank was well aware that he had been obtaining crop production loans through FmHA, and that the bank was also aware of the FmHA lien position. The Court seriously questions the credibility of this testimony in that it appears extremely doubtful that the bank would attempt to obtain an inferior security interest in crops, particularly at a time when its officers knew that the debtor to the bank would not be engaged in farming activities to even produce the collateral security.

The Court is well aware that in 1982, Gary W. Rhea was barely 17 years old, and the Debtor's father, J.H. Rhea, was in his late 70's. All of the witnesses, particularly Gary Rhea, implied that the 1982 farming operations were principally being orchestrated by Horace Rhea. The pattern of conduct related to the 1982 farming activi-

ties by the three Rheas and Byrd, to a much lessor extent, was patently an attempt to evade the FmHA crop lien which would automatically attach to Horace Rhea's crops. Since FmHA had not consented to extending an additional production loan to Horace Rhea for the 1982 crops, this scenario was contrived so that Horace Rhea could continue farming through his several alter egos.

Just as Byrd marketed his crops, as discussed hereinabove, Gary Rhea and J.H. Rhea delivered the great majority of their soybeans to the Goldkist elevator in Somerville, Tennessee. They advised the Goldkist employees that the crops were theirs, rather than crops belonging to Horace Rhea; and Goldkist issued checks accordingly. Gary Rhea received nine checks from Goldkist totaling $11,943.66, (Plaintiff's Exhibit 10), while J.H. Rhea received checks totaling $3,207.26, (Plaintiff's Exhibit 9). The lands on which the Rheas and Byrd farmed were primarily leased by several land owners to Horace Rhea, who sublet the properties in 1982 to his son, father, and son-in-law. The testimony revealed that Byrd, who was slightly more independent than Gary and J.H. Rhea, may have leased one tract of land in his own name. However, all of the equipment utilized in the planting and harvesting of these crops was owned primarily by Horace Rhea. Horace Rhea indicated that most of the proceeds from the crop sales were turned over to him so that he, in turn, could pay the landlords' rent. He complained that the proceeds were not quite sufficient to pay all of the rent that was due, falling some $300.00 to $400.00 short.

The evidence is clear and convincing that the 1982 farming operations were designed and carried out primarily to defraud FmHA, and to a lesser extent Citizens Bank. Rhea deceived Citizens Bank into thinking that he was actively farming during 1982. The Court can find no other explanation, other than this deception, prompting Citizens Bank to attempt to take a lien on the 1982 Horace Rhea crops. Even if believable, the testimony that Rhea signed documents in blank is not signifi-

cantly material, in that a person who signs any document in blank does so at his peril. Concluding this issue, the Court finds that the complaint filed by Citizens Bank against Horace Rhea is well taken, and that the debt owed by Horace Rhea to Citizens Bank in the sum of $61,824.24, plus pre-petition interest, is non-dischargeable in this bankruptcy case.

## V.

As to Goldkist, the issue to be discussed is whether a security interest was legitimately created and perfected as to Horace Rhea's crops, so that the soybean purchases by Goldkist from Byrd, J.H. Rhea, and Gary Rhea constituted a conversion of crops in violation of Citizens Bank's security interest.

MCA § 75–9–109(3) states that crops are farm products. In order to take a security interest in crops, the procedure differs very little from any other security interest. MCA § 75–9–203 provides for the "attachment" of the security interest to the collateral. MCA § 75–9–303 provides for the perfection of that interest as notice to all others. *See, In Re Moody,* 62 B.R. 282 (Bankr.N.D.MS, 1986) (unpublished). If collateral subject to a properly perfected security interest is sold without the secured party's consent, the security interest ordinarily continues in the collateral, notwithstanding the sale. MCA § 75–9–306(2). On the other hand, buyers in the ordinary course of business can take property that is collateral for a debt, free and clear of the security interest, even if they have actual knowledge of the security interest. However, specifically exempted from the class of buyers in the ordinary course of business who take free of security interests are those that purchase farm products. MCA § 75–9–307(1). *See, U.S. v. Hughes,* 340 F.Supp. 539 (N.D.Ms.—1972).

*Oxford Production Credit Association v. Dye,* 368 So.2d 241, (Ms.—1979), held that a perfected security interest in crops is notice to the world. At 242. The case also

is authority that a valid perfected security interest in crops will follow a sale of those crops. *Id.* The result in *Dye* effectively means that the purchaser of the crop, as well as, the seller-debtor are jointly liable to one who holds a valid perfected lien encumbering the crops. At 242–43. The Court further concluded that MCA § 75–9–306(2) applies to the purchaser of crops, in that the security interest continues in the collateral notwithstanding sale. *Id.*

MCA § 75–9–402(1) sets out the requirements for an effective financing statement, which provides notice to third parties that a security interest exists. MCA § 75–9–402(1) requires that a financing statement covering crops must contain a description of the real estate upon which the crops are planted. Subsection (3) of this section provides a standard form for such financing statements. The requirement of a *reasonable* description of the land, although not a legal description, has been upheld in the United States District Court and the United States Bankruptcy Court for the Northern District of Mississippi, *See: U.S. v. Smith,* 22 U.C.C.R.S. 502 (D.C.N.D.Ms.—1977); and *In Re Colbert,* 22 U.C.C.R.S. 511 (Bkrtcy.N.D.Ms.—1977).

MCA § 75–9–110 deals with the sufficiency of the description of the collateral and states as follows:

> For the purposes of this chapter any description of personal property or real estate is sufficient whether or not it is specific if it *reasonably identifies* what is described, except that a description of real estate in an instrument filed to perfect a security interest in fixtures is sufficient only if the filing or recording of the same constitutes constructive notice under the laws of this state, other than this chapter, which are applicable to the filing or recording of real estate mortgages and deeds of trust. [emphasis added]

As set forth hereinabove, MCA § 75–9–402(1) requires a description of the land upon which the crops are growing or to be grown, but must be considered with MCA § 75–9–110 which says that the description must reasonably identify the real property. The language of the statute provides that something less than a specific legal description may be acceptable, i.e., there is no need to describe the land in metes and bounds. The question now is what is the minimum acceptable standard for such land descriptions when the collateral is crops.

*U.S. v. Smith, supra.,* dealt with financing statements covering crops and the description of the location of those crops. The description gave the name of the farm, the approximate number of acres farmed, the county and state in which the land was located, and the approximate distance and direction from a named town. The court held that this constituted sufficient notice to put others on inquiry as to the location of the crops, as well as, the identity of the party holding the security interest therein. Therefore, the description was sufficient to meet the requirements of MCA § 75–9–110. At 508. *Accord, In Re Colbert, supra.*

A case involving almost the same facts as the case at bar and, indeed one of the same parties, is styled *Gold Kist, Inc. v. Farmers & Merchants Bank,* 425 So.2d 452 (Ala.1983). That case involved a security agreement and financing statement that described the collateral as, "All crops grown and harvested in 1980 (specifically 250 acres of soybeans) on land rented or leased in Baldwin County, Alabama, but not limited to the above". The Alabama Supreme Court ruled that the creditor did not have a valid security interest in the debtor's crops, and that consequently, Goldkist was not guilty of conversion of the crops. At 453. This ruling is based on Alabama's version of MCA § 75–9–203, which is substantially the same as the Mississippi statute, except for the requirement that the record owner of the land must be noted on the financing statement. The court first found that the land description was too vague based on the Alabama version of MCA § 75–9–110, and § 75–9–402(8), which are, in all material respects, the same in Mississippi. Subsequently, the court found that the name of the record owner had been omitted. At 454.

In regard to MCA § 75–9–402(8), which states that "[a] financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading.", the courts have held that omitting the land description is seriously misleading. *See,* UCC—Sufficiency of Description of Crops, Annot., 67 A.L.R.3d 308 (1975).

### VI.

At issue also is whether Goldkist had *actual* knowledge of the Citizens Bank lien. In a letter, dated November 8, 1982, the Bank gave "official notice" of their security interest in the "farm produce of Horace Rhea and Joe Byrd". (Goldkist Exhibit 2) This letter did not mention Gary Rhea or J.H. Rhea since the bank had no liens against their crops. As previously stated, Horace Rhea contends that he did not farm during 1982. He also stated that he sold no crops to Goldkist in his own name.

Upon receiving this letter Goldkist immediately began issuing Joe Byrd's checks jointly payable to Byrd and the bank. Horace Rhea's name never appeared as payee on a Goldkist check issued that year.

### VII.

The amount of the joint checks issued to Byrd and the bank exceeds the total sum of his debt to the bank. For unexplained reasons, the bank elected to apply the proceeds of the joint checks to Horace Rhea's debt. In the opinion of this Court, this does not relieve the bank of its responsibility to cancel Joe Byrd's debt. The bank should have applied the proceeds to the debt of the individual who took out the loan since these were the proceeds of the collateral securing the debt. Therefore, the Court finds that because of the bank's conduct in handling the Byrd transaction, that it is estopped to assert that Byrd's debt is non-dischargeable. The bank's complaint against Byrd will be dismissed with prejudice.

Since Byrd's debt is deemed to have been paid by tender, the claim of conversion against Goldkist by Citizens Bank as to Joe Byrd's crops, regardless of the sufficiency or insufficiency of the realty descriptions in the security agreement or the UCC–1 financing statements is not well taken and will be dismissed with prejudice. Likewise, the indemnity claim by Goldkist against Byrd will also be dismissed with prejudice inasmuch as no liability is being assessed against Goldkist regarding the purchase of Byrd's crops.

### VIII.

There is one last issue that needs to be resolved so that this proceeding might be concluded. This involves the complaint filed by Citizens Bank against Goldkist alleging conversion of the crops purportedly owned by Horace Rhea, and purportedly subject to the Citizens Bank lien.

The first point that must be reviewed is whether a lien was ever created in crops owned by Horace Rhea in favor of Citizens Bank. The real property descriptions appearing in the Horace Rhea security agreement were set forth earlier in this Opinion. The Court is of the opinion that these realty descriptions are extraordinarily vague, overly broad, and, as such, are insufficient to create a security interest in favor of Citizens Bank in any crops planted by Horace Rhea. Indeed, the words "700 Acres Soybeans and 100 Acres Corn", standing alone, *reasonably* identify nothing insofar as location is concerned. A contrary conclusion would eviserate the purpose of MCA § 75–9–110. Even if Goldkist had actual or even constructive notice of a lien encumbering Horace Rhea's crops, and these crops could be reasonably considered by a third party as being owned by Horace Rhea, particularly considering that the crops were not sold under his name, but under the names of Gary Rhea and J.H. Rhea, there was never a legitimate lien existing in said crops in favor of Citizens Bank. The realty descriptions, or perhaps more appropriately the lack thereof, prove to be fatally defective.

Although the foregoing discussion is dispositive of this question regarding the liability of Goldkist, the Court also finds that the realty descriptions in the UCC–1 financing statements are likewise defective; and as such, there was never any perfection of a lien in favor of Citizens Bank against crops grown or contemplated to be grown by Horace Rhea.

In summary, there is no reasonably identifiable description of the land on which the crops were growing or to be grown in either the security agreement or the UCC–1 financing statements executed by Horace Rhea which were introduced into the evidence in this proceeding. Therefore, the complaint filed by Citizens Bank against Goldkist regarding the conversion of crops, purportedly owned by Horace Rhea, is not well taken and is hereby dismissed with prejudice. Likewise, since there is no liability being imposed against Goldkist, the remaining indemnity claim by Goldkist against Horace Rhea is hereby dismissed with prejudice.

### IX.

The Debtors have requested that they be awarded their reasonable attorney's fees as a result of defending the causes of action filed by Citizens Bank. One authority for awarding attorney's fees appears in 11 U.S.C. § 523(d), which states as follows, to-wit:

> (d) If a creditor requests a determination of dischargeability of a *consumer debt* under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust. (emphasis added)

On its face, this section apparently applies only to complaints alleging non-dischargeability of consumer debts. Whether this was the actual Congressional intent is anybody's guess. In this proceeding, the debts, which were alleged to be non-dischargeable, resulted from crop production loans, and are obviously not consumer debts as contemplated by the statute. Regardless, the Court has found that the debt of Horace Rhea is non-dischargeable, and consequently, no attorney's fees will be awarded for his representation. From all indications, the great majority of time, expenses, etc., was incurred in the representation of Horace Rhea and Joe Byrd, as well as, to a lesser extent, Gary W. Rhea. There was little additional time and expense incurred in the representation of Dolly Rhea, Steve Lee Rhea, and Monique C. Rhea. The Court is of the opinion that the position of Citizens Bank was substantially justified in filing the complaints against Horace Rhea, Joe Byrd, and Gary Rhea; as such, no attorney's fees will be awarded to these debtors. Inasmuch as the representation of Dolly Rhea, Steve Rhea, and Monique Rhea was primarily repetitious of the representation of the other three parties, an award of attorney's fees to these debtors will likewise not be permitted.

An Order will be entered consistent with this Opinion.