In re Emmett F. FINDLEY and Florence M. Findley, d/b/a Findley Fish Farms, Debtors.

SUNBURST BANK, Movant,

v.

Emmett F. FINDLEY and Florence M. Findley, d/b/a Findley Fish Farms, Respondents.

E.T. SHURDEN, Plaintiff,

v.

Emmett F. FINDLEY and Florence M. Findley, d/b/a Findley Fish Farms; and Sunburst Bank, Formerly Known as Grenada Bank, Defendants.

Bankruptcy No. 86–01703–BRC–DEE. Adv. No. 87–0011.

United States Bankruptcy Court, N.D. Mississippi.

May 26, 1987.

Edward E. Lawler, Jr., Bennett, Lotterhos, Sulser & Geno, Jackson, Miss., for Emmett F. Findley and Florence M. Findley, d/b/a Findley Fish Farms.

P.J. Townsend, Jr., Townsend, McWilliams & Holladay, Drew, Miss., for E.T. Shurden.

Edward Tharp Cofer, Grenada, Miss., for Sunburst Bank.

## OPINION

DAVID W. HOUSTON, III, Bankruptcy Judge.

Came on for consideration the following matters, to-wit: (a) motion seeking relief from the automatic stay filed by Sunburst Bank, formerly known as Grenada Bank, referred to hereinafter as Sunburst Bank, against the debtors, Emmett F. Findley and Florence M. Findley, d/b/a Findley Fish Farms; response to said motion having been filed by the debtors; all parties being represented before the Court by their respective attorneys of record; as well as; (b) complaint filed by E.T. Shurden, plaintiff, hereinafter referred to as Shurden, against the debtors-defendants, Emmett F. Findley and Florence M. Findley, d/b/a Findley Fish Farms, and the defendant, Sunburst Bank, formerly known as Grenada Bank; answers and affirmative defenses having been filed by said defendants; all of said parties being represented before the Court by their respective attorneys of record; and the Court having heard and considered each of the above matters, hereby finds as follows, to-wit:

### I.

The Court has jurisdiction of the parties to and the subject matter of these proceedings pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. Both of these proceedings are core proceedings as defined under 28 U.S.C. § 157(b)(2)(A)(G)(K) and (M).

### II.

#### FACTUAL DISCUSSION

On or about October 1, 1984, the debtors, Emmett F. Findley and Florence M. Findley, d/b/a Findley Fish Farms, executed and delivered to Sunburst Bank a promissory note, security agreement, and UCC–1 financing statements (referred to hereinafter as financing statements), all of said documents being introduced into evidence. These documents renewed and extended an existing line of credit from Sunburst Bank to the debtors. This indebtedness was further renewed and extended by a subsequent promissory note and security agree-

ment dated April 16, 1986. The description of the collateral, which appears in both the security agreements and all of the financing statements, is recited hereinbelow:

Renewal and extension of a note and security agreement dated 06/03/83 for $2,200,000.00 secured by FmHA subordination of all crops, all catfish production, all farm equipment, and all ASCS and FCIC payments. Instruments subordinated dated and filed 06/20/75, file # 5056; 03/31/77 file # 5772; 09/15/77 file # 59; 09/15/77 file # 5968; 10/01/81 file # 8147 and security agreement dated 04/01/81. UCCs subordinated filed with the Chancery Clerk, Bolivar County, 1st District. FmHA subordination dated 05/20/83 for $2,200,000.00 plus accrued interest and funds advanced for taxes and insurance necessary to protect security property is recorded with the Chancery Clerk, 1st and 2nd Judicial District, Bolivar County, MS. Additional collateral taken this renewal is 1st mortgage on all catfish produced on 318 acres of ponds on the Bill Brown Farm and 201 acres on the Mrs. Margaret Barger Farm. All located at Schlater, Leflore County, MS. UCCs filed with the Chancery Clerk's offices of Leflore County, Bolivar County, 1st and 2nd Judicial Districts, and Secretary of State. This note is intended to cover all crop production, all catfish production, all equipment and supplies used in crop and catfish production, and any and all future purchases by Emmett F. Findley and Florence M. Findley.

In an effort to perfect the liens created by the aforementioned security agreements, Sunburst Bank filed financing statements with the Chancery Clerk of the First and Second Judicial Districts of Bolivar County, Mississippi, the debtors' residence; with the Chancery Clerk of Leflore County, Mississippi, the location of the Bill Brown farm and the Margaret Barger farm; and with the Secretary of State of the State of Mississippi. As will be discussed more fully hereinbelow, no financing statement was filed with the Chancery Clerk of Sunflower County, Mississippi, the location of the E.T. Shurden catfish ponds.

As of the date of the filing of the bankruptcy petition, November 6, 1986, the debtors owed Sunburst Bank the principal sum of $2,182,506.20, plus interest in the sum of $185,867.09, totaling $2,369,373.29, in addition to a per diem interest accrual thereafter at the rate of $448.46 per day. There was little dispute that the value of the collateral remaining was substantially less than the total indebtedness owed by the debtors to Sunburst Bank. Prior to the filing of the bankruptcy petition, Sunburst Bank had foreclosed the catfish ponds operated by the debtors at their residence in Gunnison, Bolivar County, Mississippi, and had assumed control of the catfish farming operations there as of September 30, 1986. The amount of the aforementioned indebtedness reflects the application of the foreclosure proceeds.

In addition to conducting catfish operations pre-petition at their residence, the debtors also leased catfish ponds from Bill Brown at Schlater, Leflore County, Mississippi, at a rental rate of $300.00 per land acre per year, applicable to approximately 380 total acres. By agreement, which was reduced to a Court order, Brown, the debtors, and Sunburst Bank consented to permit Sunburst Bank to operate the Brown ponds, to seine the catfish, and to place all monies received from the catfish sales in an escrow account to be distributed pursuant to the order of this Court according to the respective interests of the parties.

Pursuant to a lease contract, dated March 1, 1986, the debtors' sons, Richard W. Findley and William R. Findley, leased catfish ponds, comprising 100 acres, from E.T. Shurden. This written agreement called for an annual lease payment in the sum of $25,000.00, due March 1, 1987, one year subsequent to the date of execution. As a result of a verbal agreement finalized on July 1, 1986, Shurden leased an additional 100 acres of catfish ponds to the debtors' sons for an annual rental of $25,000.00, payable July 1, 1987. Pursuant to one or both of these agreemetns, the debtors' sons performed certain dirt work for Shurden and received a credit of $10,000.00 against the total annual rent. Shurden verified

that this work was, in fact, performed, and that the annual rent should be reduced to the total sum of $40,000.00. As a part of the written lease contract, which was witnessed but not executed by Emmett F. Findley, the debtors' sons purported to convey to Shurden a contractual lien on "all fish now in and hereafter placed or born in said ponds on the said premises leased hereby to secure the payment of the rental for said premises for the then current year and prior years." In an effort to perfect this contractual landlord's lien, Shurden recorded a financing statement *post-petition* on November 10, 1986. On this same date, Shurden, joined with his wife, Florene Shurden, filed a complaint in the Chancery Court of Sunflower County, Mississippi, against the debtors' sons, as well as, Grenada Bank, demanding judgment in the sum of $40,000.00, and requesting that a lien be impressed against the catfish located in the Shurden ponds. No further action has been taken by the Shurdens in prosecuting this litigation.

Following a hearing in this Court on December 20, 1986, an order was entered adjudicating that the catfish located in the Shurden ponds were not the property of Richard W. Findley and William R. Findley, but, in fact, were the property of the debtors' bankruptcy estate as contemplated by 11 U.S.C. § 541(a). This order was supported by the fact that the debtors' sons testified without reservation that they owned no interest in these catfish.

Similar to the arrangements made at the Brown catfish ponds, Sunburst Bank also assumed the management of the catfish operations at the Shurden ponds. The Court is of the opinion that this assumption occurred shortly after September 30, 1986, which comports with the date that Sunburst Bank assumed the operations at the debtors' residence. Subsequently, an order was entered to the effect that the bank would conduct seining operations at the Shurden ponds, market the catfish, and place the sales proceeds in an escrow account. The funds in this account are to be ultimately distributed following a determination by this Court as to the respective interests of the parties therein.

Although the fish are being seined, removed from the Brown and Shurden ponds, and sold, the Court considers that the status quo of all lien claims has been preserved just as if these harvesting operations were not being undertaken.

The debtors, on more than one occasion, have requested that this Court authorize them to retake possession of the catfish at the three farms, so that their reorganization efforts could be initiated. The Court has refused these requests for the following reasons:

(1) The debtors have exhibited no source of income to care for, feed, or maintain the catfish. There was even no source of income to pay for the reinstallation of such essentials as electricity or other utilities.

(b) Actual seining operations at the several catfish pond locations has proved the debtors' projections of fish on hand to be substantially overestimated. The debtors' plan projections are likewise overly optimistic and unrealistic. Considering the expert testimony, the debtors' plan of reorganization does not appear feasible or even remotely probable.

(c) Operating funds could only come from the use of cash collateral. The debtors have not presented formerly a motion to use cash collateral; but even so, it is highly unlikely that they could provide adequate protection to those creditors whose cash collateral would be expended.

(d) If the debtors were to succeed in their proposed reorganization, they would be required to enter into lease agreements with not only Sunburst Bank, but also Brown and Shurden. In keeping with the provisions of 11 U.S.C. § 365(b), the debtors have exhibited no prospects whatsoever that they could cure the existing defaults in the Brown and Shurden leases, nor could they provide adequate assurance of future performance under the terms of those leases. There has been no evidence offered that a lease agreement could even be negotiated with Sunburst Bank, nor that the debtors were capable of performing thereunder.

## III.

### DISCUSSION OF LEGAL ISSUES—VALIDITY OF SUNBURST BANK LIEN

██ The first, and perhaps the most significant issue that will be discussed in this opinion, is whether Sunburst Bank holds a bona fide lien encumbering the debtors' catfish. As noted in the factual discussion, Sunburst Bank's lien, if it is in fact valid, exists by virtue of the several security agreements and the recorded financing statements. The description of the collateral has been set forth verbatim hereinabove. In Mississippi, catfish have become a major product in our agricultural economy. As such, catfish, whether a crop, livestock, or something in between, are a critical "collateral resource" to the catfish · farmer. Therefore, the question that has emerged in this case is how must a secured lender mechanically create and then perfect a lien on catfish.

Except for the location of the Shurden ponds in Sunflower County, Mississippi, where the debtor's catfish were placed by the debtors' sons without the knowledge or consent of Sunburst Bank, the filings of the financing statements appear to be proper, regardless of the nature of the collateral. See the pertinent provisions of MCA § 75–9–401(1), which are set forth as follows:

(1) The proper place to file in order to perfect a security interest is as follows:

(a)(i) When the collateral is equipment used in farming operations, or accounts or general intangibles arising from or relating to the sale of farm products by a farmer, in the office of the chancery clerk in the county of debtor's residence or, if the debtor is a nonresident of this state, in the office of the chancery clerk in the county where the goods are kept;

. . . .

(iii) When the collateral is farm products, in the office of the chancery clerk in the county of debtor's residence or, if the debtor is a nonresident of this state, in the office of the chancery clerk in the county where the goods are kept; and in the office of the secretary of state;

(iv) When the collateral is crops growing or to be grown, in the office of the chancery clerk in the county where the land is located; and, if the debtor is a resident of this state, in the office of the chancery clerk in the county of debtor's residence; and in the office of the secretary of state.

. . . .

(c) In all other cases, in the office of the secretary of state and in addition, if the debtor has a place of business in only one (1) county of this state, also in the office of the chancery clerk of such county, or, if the debtor has no place of business in this state but resides in the state, also in the office of the chancery clerk of the county in which he resides.

The issue in this case is premised not so much on the proper recordation of the financing statements, but rather the sufficiency of the collateral description appearing in both the security agreements and the financing statements. If catfish are to be considered purely a crop, then a description of the real estate where the crops are located must be incorporated both in the security agreements and the financing statements. If the catfish are considered as some other form of agricultural product, such as livestock, there is no requirement that a description of the real property be included. MCA § 75–9–203(1)(a) and § 75–9–402(1), set forth this distinction as follows:

§ 75–9–203.

(1) Subject to the provisions of section 75–4–208 on the security interest of a collecting bank and section 75–9–113 on a security interest arising under the chapter on Sales, a security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless

(a) the collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral and, in addition, *when the security interest covers crops growing or to be grown or timber to be cut, a description of the land concerned;* and

(b) value has been given; and

(c) the debtor has rights in the collateral. [emphasis added]

§ 75-9-402.

(1) A financing statement is sufficient if it gives the names of the debtor and the secured party, is signed by the debtor, gives an address of the secured party from which information concerning the security interest may be obtained, gives a mailing address of the debtor, and contains a statement indicating the types, or describing the items, of collateral. A financing statement may be filed before a security agreement is made or a security interest otherwise attaches. *When the financing statement covers crops growing or to be grown, the statement must also contain a description of the real estate concerned.* [emphasis added]

From the above statutes, it appears obvious that a description of the location of crops is necessary for the *creation* and *perfection* of a valid security interest therein. The description does not have to be a formalized legal metes and bounds description, but need only reasonably identify the real property. See MCA § 75-9-110, which provides as follows:

§ 75-9-110.

For the purposes of this chapter any description of personal property or real estate is sufficient whether or not it is specific if it *reasonably identifies* what is described, except that a description of real estate in an instrument filed to perfect a security interest in fixtures is sufficient only if the filing or recording of the same constitutes constructive notice under the laws of this state, other than this chapter, which are applicable to the filing or recording of real estate mortgages and deeds of trust. [emphasis added]

This Court has discussed the sufficiency of property descriptions in *In re Byrd*, 66 B.R. 261 (Bankr.N.D.Ms.1986). There the Court found that "700 Acres Soy Beans and 100 Acres Corn and other Chattels" was insufficient to constitute a reasonable description of the location of crops, and

thus, the security interest was not created or perfected. This decision was consistent with *United States v. Smith*, 22 UCCRS 502 (N.D.Ms.1977) and *In re Colbert*, 22 UCCRS 511 (N.D.Ms.1977), both of which held that a description providing the names of the farms, the approximate number of acres, the county and state in which the land was located, as well as, the approximate distance or direction from a named town was sufficient to satisfy the requirement of a reasonable property description. If catfish are indeed crops in the pure sense of MCA § 75-9-402, then the security agreements and financing statements, attempting to encumber those catfish, must include a reasonable description of the real property where the catfish are located in order to satisfy the requirements of MCA § 75-9-110.

The first question that must be answered, therefore, is whether catfish should be treated as a crop, with the attendant requirement that a reasonable description of their location be incorporated in the security agreements and financing statements, or whether some lesser standard will suffice. Unfortunately, there is no legislation that specifically addresses this issue. Consequently, it is left up to this Court to draw the distinction in what must be considered a case of first impression.

Several statutes, both state and federal, include catfish within the definition of crops. MCA § 69-7-501, under the heading Domestic Fish Farming, enacted prior to the Uniform Commercial Code, states that:

In recognition of the fact that domestic fish farming has become an important part of the agricultural economy of this state, the legislature hereby determines and declares that whenever any of the statutes, laws, or regulations promulgated pursuant thereto, shall use any of the following terms, such terms so used and when used, shall be deemed and construed to include within the common or statutory definition thereof, the following:

. . . .

(b) The term "cultivated crop" shall include domesticated fish which are grown, managed or harvested on an annual, semiannual, biennial or short interval basis.

(c) The term "livestock" shall include domesticated fish which are grown, managed, harvested and/or marketed as a cultivated crop.

(d) The term "domesticated fish" shall be understood to mean any fish that are spawned and grown, managed, harvested and marketed on an annual, semiannual, biennial or short term basis, in privately owned waters.

16 U.S.C. § 778, applicable to fish research and experimentation programs, reads as follows:

The Secretary of the Interior or the Secretary of Commerce, as appropriate, is authorized and directed to establish an experiment station or stations for the purpose of carrying on a program of research and experimentation—

. . . .

(5) to determine, in cooperation with the Department of Agriculture, the effects of fish—rice rotations, including crops other than rice commonly grown on rice farms, upon both the *fish and other crops;* and

(6) To develop suitable methods for harvesting the *fish crop* and preparing it for marketing, including a study of sport fishing as a means of such harvest. [emphasis added]

7 CFR § 650.26 deals with agriculture, soil conservation and environmental concerns. The policy promulgated therein exempts certain wet lands in the following categories:

(b)(1) Lands that were artificially dyked and flooded to produce, and have a *cropping* history of producing *crops* such as *fish,* crayfish, domestic rice, wild rice, or cranberries. [emphasis added]

Thus, not only the State of Mississippi, but the federal government has included catfish within the definition of the word crop.

The following cases in one way or another allude to whether catfish or fish in general should be included in the definition of the word crop.

*Crow v. Central Soya Company, Inc.,* 651 S.W.2d 392 (Tx.App. 2nd Dist.1983), dealt with an action for damages against the supplier of fish food. Although the decision did not determine whether fish were, in fact, crops, it constantly referred throughout the opinion to the "catfish crop."

*State v. Keel,* 33 Ala.App. 609, 35 So.2d 625 (1948), interpreted § 21 of Title 8 of the 1940 Alabama Code, which prohibited the director of conservation from promulgating rules which "will hamper or interfere with the catching, the marketing, the sale or re-sale or buying of the *fish crop* ..." (emphasis added)

*Hogan v. Brown,* 507 F.Supp. 191 (D.Ark.1980), *aff'd with opinion,* 665 F.2d 849 (8th Cir.1981), was a case where certain property owners brought suit against the Corps of Engineers alleging violations of the National Environmental Policy Act. The court entertained the testimony of several expert witnesses who testified as to the impact of the project on the environment. Several of the experts referred to the fish population as a crop. As an example, the following two sentences are excerpted from the case: "The standing crop data from Felsenthal indicate that the productivity is high with respect to commercial and sport fisheries—around 700 pounds per acre. A high portion of this total crop is in gizzard shad, buffalo fishes, and bullfin, but there are also good populations of large-mouth bass, carpe, sunfish, and catfish." At 200.

*In Re: Dunkly,* 64 F.Supp. 10 (N.D.Ca. 1946), held that fish *were not livestock* for the purpose of determining whether the debtors were farmers under § 75 of the Bankruptcy Act. The question of whether the fish were crops was not reached by the court.

*Brundidge Milling Company, Inc. v. State,* 45 Ala.App. 208, 228 So.2d 475 (1969), held that catfish *were not livestock* so as to be exempted from certain tax provisions of the Alabama Code.

Generically speaking, catfish, in at least an agricultural vernacular, could certainly be labeled as a crop. However, for purposes of the Uniform Commercial Code, should such a definition be appropriate? The debtors in this case have offered a syllogistic approach to include catfish within the definition of crops. Their approach is outlined as follows:

MCA § 75–9–105(1)(h) includes farm raised fish produced in fresh water within its definition of "goods".

MCA § 75–9–109(3) states that " 'goods' are 'farm products' if they are crops or livestock or supplies used or produced in farming operations or if they are products of crops or livestock in their unmanufactured states (such as ginned cotton, wool clip, maple syrup, milk and eggs), and if they are in the possession of a debtor engaged in raising, fattening, grazing, or other farming operations." The section goes on to state that if goods are farm products they are neither equipment nor inventory.

The debtors conclude that since "crops" are included within the definition of "farm products", that catfish are therefore crops. As such, in order to create a security interest and then perfect a lien on catfish, a reasonable description of the location of the catfish should be an integral part of the security agreements and financing statements.

The debtors' reasoning, however, is flawed simply because "livestock" is also included within the ambit of "farm products". As noted earlier, a perfected lien encumbering livestock does not require a description of the location of the livestock in the security instruments.

Until there has been some definitive legislation to resolve this dilemma, i.e., what is necessary to create and perfect a lien on catfish, this Court takes the position that catfish should not be included within the definition of crops insofar as a reasonable location description is required to create and perfect a lien thereon. The following reasons, which are more visceral than scientific, support this conclusion:

1. Livestock, considered to be within the animal kingdom, are mobile and generally are not expected to be on the same land at all times. Livestock can be moved from pasture to pasture or farm to farm without significant risk of mortality. This Court is of the opinion that the mobility factor is a primary reason for not requiring a description of the location of livestock in security agreements and financing statements.

2. Growing crops, generally considered to be within the plant kingdom, are not mobile and remain on the same land for the entire growing season from planting to harvesting. These crops, such as cotton, soybeans, wheat, and rice, are attached to the ground and cannot be transplanted without substantial risks of mortality. A description of the location of these crops is workable, practical, and reasonable.

3. Catfish ordinarily would be considered as members of the animal kingdom. They enjoy a degree of mobility, but with certain risk of mortality and at considerable relocation expense. Catfish usually remain in the same ponds from either birth or fingerling size until they are harvested at maturity. However, there are many occasions, existing even in the case now before this Court, that catfish are moved with regularity for varying reasons.

In reality, insofar as mobility is concerned, catfish lie somewhere between planted and growing crops on the one hand and livestock, such as cattle, pigs, and sheep, on the other hand. Because of this reason alone, this Court is reluctant to enlarge the provisions of MCA § 75–9–203(1)(a) and MCA § 75–9–402(1) to require a reasonable description of the location of catfish collateral. Considering the significance of this issue in the State of Mississippi, the Legislature should promptly and decisively address this uncertainty for the benefit of catfish farmers and secured lenders alike.

This Court would surmise that there are a number of security agreements and financing statements, executed and recorded, that do not contain a description of the location of the real property where catfish, serving as loan collateral, are located. Un-

der the existing state of our law, these security agreements and financing statements are not per se defective. The secured lending community should not be stunned with a decision holding that all security agreements and financing statements encumbering catfish are invalid because of a lack of a property description when these agreements were taken in good faith and in the absence of a clear statutory directive.

Consequently, it is the opinion of the Court that the lien of Sunburst Bank, encumbering those catfish owned by the debtors, is valid and perfected, subject to the issue of priority which will be discussed subsequently.

## IV.

## LEGAL DISCUSSION—MOTION OF SUNBURST BANK SEEKING RELIEF FROM THE AUTOMATIC STAY

■ In order to obtain relief from the automatic stay, the requirements of 11 U.S.C. § 362(d)(1) or § 362(d)(2)(A) and (B) must be met, to-wit:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
>> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or
>>
>> (2) with respect to a stay of an act against property under subsection (a) of this section, if—
>>
>>> (A) the debtor does not have an equity in such property; and
>>>
>>> (B) such property is not necessary to an effective reorganization.

As noted hereinabove, there is no dispute that the debtors have no equity in the remaining collateral pledged to Sunburst Bank. Also, from the discussion regarding the debtors' ability to reorganize, it is the opinion of the Court that the debtors have no ability to reorganize nor are their prospects of reorganization feasible. For these reasons, subject to the priority of liens issue, the motion seeking relief from the automatic stay filed by Sunburst Bank is found to be well taken and is hereby sustained.

## V.

## LEGAL DISCUSSION—PRIORITY OF LIENS DISPUTE BETWEEN SUNBURST BANK AND SHURDEN CONCERNING THOSE CATFISH LOCATED IN THE SHURDEN PONDS

■ As noted hereinabove, the debtors' sons, Richard W. Findley and William R. Findley, leased catfish ponds from E.T. Shurden pursuant to a written lease dated March 1, 1986, and a verbal agreement, finalized on July 1, 1986. They stocked these ponds with fish which were owned by the debtors, a fact unknown to Shurden, and without the consent of Sunburst Bank. According to the written lease, the debtors' sons purported to give Shurden a contractual lien against the catfish to secure the payment of the annual rent. Although Shurden attempted to perfect this lien postpetition, the Court finds that the contractual lien is totally invalid in that the debtors' sons owned no interest in the catfish, and as such, had no legal authority whatever to convey a contractual lien.

■ In the alternative, Shurden contends that he holds a statutory landlord's lien as a result of MCA § 89–7–51, which is set forth as follows:

> Every lessor of land shall have a lien on the agricultural products of the leased premises, however and by whomsoever produced, to secure the payment of the rent and of money advanced to the tenant, and the fair market value of all advances made by him to his tenant for supplies for the tenant and others for whom he may contract, and for his business carried on upon the leased premises. This lien shall be paramount to all other liens, claims, or demands upon such products. The claim of the lessor for supplies furnished may be enforced in the same manner and under the same circumstances as his claim for rent may be;

and all the provisions of law as to attachment for rent and proceedings under it shall be applicable to a claim for supplies furnished, and such attachment may be levied on any goods and chattels liable for rent, as well as on the agricultural products.

In Mississippi, it has long been established that the landlord's crop lien is paramount to all other liens. *Tennessee Joint Stock Land Bank v. Bank of Greenwood*, 179 Miss. 534, 172 So. 323 (1937), and *Goodwin v. Mitchell*, 38 So. 657 (Ms.1905). In this case, Shurden must rely on his landlord's lien because he has no perfected contractual lien which could be considered valid under the Uniform Commercial Code. It has already been mentioned that the lien of Sunburst Bank was not perfected in Sunflower County, Mississippi, the location of the Shurden ponds. However, this is immaterial in view of the fact that Shurden's landlord's lien enjoys priority, under most circumstances, over even the perfected lien of Sunburst Bank insofar as the catfish located in the Shurden ponds are concerned. Chapter 9 of the Mississippi Uniform Commercial Code expressly exempts landlord's liens from its coverage through MCA § 75–9–104, which provides as follows:

> § 75–9–104. Transactions excluded from chapter.
>
> This chapter does not apply
>
> . . . .
>
> (b) to a landlord's lien; . . .

Such an exclusion has been recognized by the vast majority of authorities. *See Re: Einhorn Bros., Inc.*, 272 F.2d 434 (3rd Cir.1959); *Dwyer v. Cooksville Grain Co.*, 117 Ill.App.3d 1001, 73 Ill.Dec. 497, 454 N.E.2d 357 (1983); *Hartwell v. Hartwell*, 167 N.J.Super. 91, 400 A.2d 529 (1979); *Associates Financial Services of Texas, Inc. v. Soloman*, 523 S.W.2d 722 (Tex.Civ. App.1975); *National Investment Trust v. First National Bank*, 88 N.M. 514, 543 P.2d 482 (1975); *Bates and Springer of Arizona, Inc. v. Friermood*, 109 Ariz. 203, 507 P.2d 668 (1973); and *Universal C.I.T. Credit Corp. v. Congressional Motors, Inc.*, 246 Md. 380, 228 A.2d 463 (1967).

Shurden's landlord's lien has not been avoided in this case pursuant to 11 U.S.C. § 545(3), so it must be presumed valid and enforceable for purposes of this opinion.

Although the catfish located in the Shurden ponds have been previously found by this Court to be property of the debtors' estate, this finding is immaterial insofar as the enforcement of Shurden's landlord's lien is concerned. From the testimony elicited at the hearings conducted before the Court, it became apparent that the debtors consented to and, indeed, encouraged their sons to enter into the lease agreement and place the catfish in the Shurden ponds. Even had this not been the case, the statutory landlord's lien in Mississippi is paramount to all other liens or claims as to the catfish *regardless of the actual ownership*. *See Hooks v. Burn*, 168 Miss. 723, 152 So. 469 (1934); *Dale v. Webb*, 166 Miss. 309, 146 So. 875 (1933); and *Applewhite v. Nelms*, 71 Miss. 482, 14 So. 443 (1894).

Therefore, the Court finds that Shurden's statutory landlord's lien for rent due and owing, the amount of which is discussed below, enjoys priority over the lien of Sunburst Bank, whether perfected or not in Sunflower County, Mississippi.

## VI.

### LEGAL DISCUSSION—AMOUNT OF SHURDEN RENT

In his brief, Shurden claims the following amounts as rent:

| | |
|---|---:|
| 1. Rent on 100 acres from March 1, 1986 to July 1, 1986 at $68.49 per day for 122 days. | $ 8,355.78 |
| 2. Rent on 210 acres from July 1, 1986 to March 31, 1987 at $136.98 per day for 274 days | 37,532.52 |
| | $45,888.30 |

In addition, Shurden claims rent after March 31, 1987, until possession of his ponds is delivered at the rate of $136.98 per day.

Although the Court is aware that Shurden is entitled to compensation in the form of rent, the figures quoted above are substantially exaggerated. As set forth in the

earlier discussion, Shurden admitted that the total rent due under the two lease agreements was only $40,000.00, considering the application of the $10,000.00, earned by the debtors' sons as a result of their dirt work. This is consistant with the lawsuit that Shurden filed in the Chancery Court of Sunflower County, Mississippi. *Since the payment of the Shurden claim must necessarily come from the landlord's lien impressed on the proceeds received as a result of the catfish sales*, this Court is presented with somewhat of a dilemma in assessing the precise amount of this lien. Questions that must be resolved are as follows:

1. What proceeds from the sale of catfish have been generated from those fish that were harvested on ponds covered by the March 1, 1986 written lease?

2. What proceeds from the sale of catfish have been generated from those fish that were harvested on ponds covered by the July 1, 1986 verbal lease?

3. Against which ponds should the $10,-000.00 credit be applied?

From the testimony presented at the hearing on the Shurden complaint, the Court is of the opinion that the rental charged by Shurden is fair and reasonable, but that this rental for both leases should not exceed the maximum sum of $40,-000.00, which would be payable if both leases were considered to have run for their full terms. However, the exact amount of rental can only be determined following the resolution of the aforementioned three questions. The proof will be reopened in this adversary proceeding for this limited purpose, and a hearing will be scheduled by the Court so that additional clarifying testimony might be taken.

An Order will be entered consistent with this Opinion.